# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 1:17 MJ 209-1 |
| THE PREMISES LOCATED AT: 7035 CANOPY LANE, CHAPEL HILL, NC, 27516 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

THE PREMISES LOCATED AT: 7035 CANOPY LANE, CHAPEL HILL, NC, 27516, as further described in Attachment A

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 18 USC 1962 | RICO | |

The application is based on these facts:

See attached affidavit of Special Agent Eric Nye, FBI

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Eric Nye, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __06/20/2017  12:50 PM__

_____
*Judge's signature*

City and state: __Durham, NC__

Joe L. Webster, U.S. Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT FOR THE

# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | |
| 7035 CANOPY LANE, | ) | Case No. 1:17MJ 209-1 |
| CHAPEL HILL, NORTH CAROLINA, 27516 | ) | |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Eric Nye, Special Agent (SA), Federal Bureau of Investigation (FBI), Charlotte Division

(CE), Raleigh-Durham Resident Agency, Cary, NC, being duly sworn, states the following:

## INTRODUCTION

1.     I am an investigative or law enforcement officer of the United States within the meaning

of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is

empowered by law to conduct investigations and to make arrests for offenses enumerated in Title

18 U.S.C. § 2516.

2.     Your affiant is a Special Agent with the Federal Bureau of Investigation (FBI) and has

been so employed since 2006.  I have authored, executed, and/or participated in over fifty search

and seizure warrants for illegal narcotics and related paraphernalia.  I have participated in the

operation and execution of over thirty Federal and State Title III orders.  I have arrested and/or

participated in the arrest of over 100 persons for violations of State and Federal narcotics statutes.

I am currently assigned to investigate violent gangs in the Durham metropolitan area as a member

of the FBI's Safe Streets Task Force and have received over 100 hours of specialized training in

the area of illegal narcotics and violent street gangs.

3.     Through instruction and participation in investigations, I have become familiar with the

manner in which gang members and narcotics traffickers conduct their illegal business, and the

1

methods, language, and terms which are used to disguise conversations about their gang and narcotics activities. Additionally, I have become familiar with gang members' methods of operation, including gang organizational structure, methods of violence, distribution, storage, and transportation of narcotics, and how firearms are obtained and transported. Through my experience and training, I have learned that gang members and narcotics traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be subject to physical surveillance by law enforcement authorities. I also have learned that gang members and narcotics traffickers rarely refer to heroin, cocaine, cocaine base (also known as "crack"), phencyclidine (PCP), or other illegal drugs expressly by name. Instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, narcotics traffickers routinely refer to drugs, drug quantities, and drug prices by using seemingly innocuous words or phrases. I also know that gang members and drug traffickers frequently have access to several cellular telephones and that they periodically use newly-acquired cellular telephones, all in an effort to avoid detection and to avert law enforcement efforts. I also know that gang members and drug traffickers communicate via text message to discuss types, quantities, prices of narcotics, as well as to discuss meeting locations, all in an effort to elude detection and to impede the efforts of law enforcement. Finally, I know that gang members to maintain documents, both physical and digital, on their person or in their residence. These documents include gang knowledge, history, rules, and information provided by national-level gang leadership. These documents are often hidden inside of legitimate documents, or written in code, to thwart law enforcement attempts to glean any intelligence concerning the criminal enterprise, its rules, or its membership.

2

4.     This affidavit is made in support of an application for a warrant to search the premises described as 7035 Canopy Lane, Chapel Hill, North Carolina. This affidavit is based upon information I have gained through this investigation, as well as information from other law enforcement officers and individuals associated with this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence of violations of Title 18, United States Code, Section 1962 (RICO) is stored within the above-mentioned premises located at 7035 Canopy Lane, Chapel Hill, North Carolina, 27529.

**BACKGROUND**

5.     The Raleigh-Durham Safe Streets Task Force is currently investigating the violent criminal enterprise (gang) known as the Nine Trey Gangster Bloods, which is responsible for a significant portion of the violent crimes and drug distribution in the Raleigh-Durham area.

6.     The Bloods are a criminal street gang originating in Los Angeles, California during the 1970s. The Bloods were founded as a response to the rise and dominance of the Crips street gang in Los Angeles. The presence of Blood gangs has spread from its origins in Los Angeles across the country and to the East Coast. Various branches, sets and sub-sets of the Bloods street gang have developed.

7.     The United Blood Nation (UBN) is an alliance of Blood gangs that is active on the East Coast of the United States and is an off-shoot of the California-based Bloods. The UBN was initially established in New York City in 1993 as a gang alliance among African-American gangs within the Rikers Island jail complex. The alliance was created to give themselves protection from the larger Hispanic gangs within the prison system.

3

8. The Nine Trey Gangster Bloods, also referred to as Nine Trey Gangstas, NTG, 9-Trey, 9-3, Billy Bad Ass, BBA, and/or Billies (hereinafter, NTG) are a set of the UBN. There are numerous Blood sets under the UBN umbrella but NTG was one of the initial sets to be organized.

9. Since its inception, the UBN and NTG have spread from New York and New Jersey throughout the eastern and central United States to include Georgia and North Carolina.

10. National leadership of NTG lies in New York. However, high level NTG leadership has been identified within the Georgia Department of Corrections (GDOC) and the North Carolina Department of Corrections (NCDOC).

11. Leadership ranks within the Nine Trey Gangster Bloods are as follows:
- GF – Godfathers
- High O20 – State level leader with national authority
- Low O20 – State level leader or leaders with no national authority
- 5th Floor or 5 Star
- 4th Floor or 4 Star
- 3rd Floor or 3 Star
- 2nd Floor or 2 Star
- 1st Floor or 1 Star
- Green Light
- Scrap or Soldier

12. NTG is a violent criminal enterprise that has a clear hierarchy of members. Members of NTG engage in numerous crimes, including racketeering, murder, aggravated assault, robbery, burglary, weapons violations, sex trafficking of women, distribution of illegal drugs, and various forms of fraud. Indeed, one of the ways members move up the gang hierarchy is by "putting in work" (the commission of criminal activities). Accordingly, "putting in work" includes committing acts of violence at the direction of NTG leadership, as well as instigating illegal money-making ventures such as drug and weapons trafficking and fraud schemes, including bank and wire fraud. For example, gang members who carry out a murder or assault at the direction of

4

gang leadership often receive status ("stain") in the NTG hierarchy. Members who supply gang members with firearms also receive status in the NTG hierarchy. Money generated through criminal activities is used to pay membership dues. Additionally, these illegal proceeds are also used to fund special collections. In turn, these membership dues and special collections are then used to pay for bond for members who have been arrested, to pay for legal fees for members who have been charged criminally, as payment to members who carry out violent activities on behalf of the gang (murder for hire), and to put money "on the books" of incarcerated members of the NTG leadership, amongst other things. Those members who generate more money through successful criminal activities and are able to contribute more in dues and to special collections receive greater status in the NTG hierarchy. This provides members with incentive to remain in the gang and successfully carry out criminal activities in furtherance of the gang.

13. The rank structure often includes separate delineation between incarcerated and non-incarcerated members. In many instances, high ranking leadership within the prison system exerts control over the membership "on the street." Dues are obtained from low level members and paid up through the gang's chain-of-command.

14. Members are required to learn the history, by-laws, traditions, customs, codes/language and protocols of the gang, often referred to as the gang's "knowledge" or "food," which is often written down by the members. Members are often "G-Checked," in which a member's knowledge of the enterprise is tested to determine if he or she is an actual member of the enterprise, or if he or she is falsely identifying with the gang.

15. NTG members are encouraged to engage in criminal activity with other NTG members wherever possible, as they believe this provides them a safe haven to engage in criminal activity with partners they can trust. NTG members often specialize in a particular criminal field such as

drug trafficking, firearms trafficking, sex trafficking or fraud. When an NTG member uses another member as part of criminal activity, such as acquiring a firearm from another member, there could be negative repercussions for those members who later assist law enforcement or fail the member in some other way.

16.     Members display their affiliation in many ways, including using specific lingo, graffiti, colored clothing, tattoos, symbols, and hand signs. This includes pictures, videos, codes and lingo posted on the internet and social networking sites such as Facebook, Instagram, and Twitter. Specifically, Blood gang members often wear red-colored items of clothing to demonstrate their membership. Bloods are also represented by the symbol of the five-pointed star or the number "5" in tribute to the five-pointed star.

17.     Gang members, whether acting individually, in small groups, or under the direction and control of the leaders, are held accountable to the upper echelon within the organization, particularly if their actions draw attention to the enterprise from law enforcement. Members who violate gang rules or codes, attempt to leave the gang, refuse or fail to pay dues, or who refuse or fail to complete particular tasks or criminal missions, are subject to discipline by the other members of the enterprise, which can include beatings and possibly death. This helps to solidify the structure of the gang and provides members with incentive to remain an active part of the gang.

**Investigation of the Nine Trey Gangster/Fire Line in the Raleigh-Durham Area by the Raleigh-Durham Safe Streets Task Force (RDSSTF)**

18.     The RDSSTF's investigation began in 2012 in Durham, North Carolina, with the targeting of The Family of Bosses Music Group (FOBMG), or "FOB," which is a violent cocaine and heroin distribution organization operating in North Carolina, Georgia, New York, and New Jersey. The Family of Bosses is closely affiliated with the United Blood Nation (UBN), Nine Trey

6

Gangsters set, and have ties to United Blood Nation leadership in New York, Virginia, Georgia, and other cities within North Carolina. The major contributors to the FOB in the Durham area are members of the NTG, specifically the Fire Line of the NTG.

19.     Information provided in numerous source debriefings and NCDOC monitored calls suggested that the FOB is led by MESSIAH MAY, aka "Si," aka "Siah." MAY, originally from New York, is a convicted felon with multiple arrests in the city of Durham, North Carolina for drug trafficking and related offenses. MAY is unemployed; however, he drives several high-end cars and sport utility vehicles, and maintains residences in Durham, Raleigh, Atlanta, and New York. Within gang hierarchy, MAY has been identified as the NTG/Fire Line "Low" in North Carolina and falls directly under Shamauri CARR, aka "Fire." At the time of the investigation's opening, CARR was the NTG/Fire Line "High" for both North Carolina and Georgia. CARR maintained a residence in Morrisville, North Carolina, but lived in Atlanta as well. A relationship between CARR and MAY has been corroborated through numerous money transfers between the two, multiple human source reports, and court-authorized wire intercepts.

20.     The RDSSTF began to investigate the gang activities of CARR and MAY, and the NTG Fire Line, in 2012, with the intent of dismantling the criminal enterprise (UBN/NTG-Fire Line) that was distributing large amounts of illegal narcotics, and conducting armed home invasions, shootings, murders, armed robberies, and other violent crimes in the Durham area of North Carolina.

21.     During that investigation, Tyree CATES was identified as a close associate of MAY. CATES has been validated by the Durham Police Department as a member of the Nine Trey Gangster (NTG).

22.  On April 17, 2013, CATES was inside of a vehicle stopped by DPD at the direction of the SSTF.  The SSTF was conducting surveillance on a residence known to be frequented by NTG members and known to be rented by Doris CATES.  The vehicle was driven by Doris CATES. Tyree CATES and Freddy JACKSON were passengers in the vehicle.  The vehicle was stopped due to fictitious tags.  The officer noticed nervous behavior being exhibited by Tyree CATES. Specifically, CATES was awkwardly keeping his left elbow on top of the center console. Subsequently officers located lose Percocet pills inside of the center console and two pills between the seat.  Additionally, JACKSON was found to be in possession of a firearm.  Tyree CATES was issued a citation for possession of schedule II.  Doris CATES was arrested and charged with trafficking by possession, trafficking by transport, PWISD schedule II, and felony maintaining a vehicle for the purpose of selling controlled substances.  JACKSON was arrested for felon in possession of a firearm.

23.  In April 2013, investigators analyzed certain wire transfers of money to Garland TYREE, who was an inmate with the New York State Department of Corrections at the time.  At the time, TYREE and an individual named Pedro GUITIERREZwere acknowledged as the two UBN Godfathers.  TYREE was killed during a shootout with the New York Police Department and the United States Marshal's Service in August 2015 and GUITIERREZ is currently incarcerated with the New York State Department of Corrections.  One of the individuals sending money to TYREE was Doris CATES.  Based on training, knowledge, and experience, as well as facts referenced *infra* herein, your affiant believes that CATES, in her specific role within the NTG in Durham, was sending gang dues to TYREE on behalf of Messiah MAY and other NTG members.  This investigation has shown Doris CATES to assist the NTG and associates by keeping legal

8

documents and traceable paperwork in her name. Specifically, CATES has kept rental property, rental cars, and wire transfers in her name on behalf of the NTG.

24.     On July 18, 2013, members of the DEA's Baltimore-Washington High Intensity Drug Trafficking Area (HIDTA) Group interviewed CD1[1] concerning trips to North Carolina to purchase large quantities of cocaine and heroin. CD1 described multiple trips to a location in North Carolina maintained by the NTG that they referred to as the "Farm." Through later investigative work, agents have determined that the "Farm" was the residence located at 8405 NC Highway 751 in Durham, NC. CD1 explained that this was the home of Demarcus CATES. While CD1 was frequenting the "Farm" and buying large amounts of cocaine from Demarcus CATES, CD1 was also interacting with multiple NTG members. CD1 was presented with pictures by investigators, at which time he identified Messiah MAY, Tyree CATES, Doris CATES, and many others. CD1 eventually began purchasing heroin directly from MAY at this residence. CD1 witnessed pressing equipment used to press drugs after they had been "cut." CD1 witnessed MAY "cutting" and mixing heroin in the kitchen. During these trips, CD1 explained that Doris CATES was present for some of the cocaine deals. CD1 identified Doris CATES as the mother of Demarcus CATES. CD1 identified a picture of Tyree CATES as a person that was at the "Farm" during the drug transactions but did not know his name.

25.     On October 3, 2013, members of the SSTF interviewed CD2.[2] CD2 was aware of, and had visited, the "Farm." CD2 confirmed the statement of CD1 in that there were large amounts of both cocaine and heroin being distributed out of that house. Additionally, the proceeds from the sale of those narcotics would be returned to the house and then used to purchase new shipments of

---

[1] CD1's information has been corroborated to a great extent and determined to be truthful and accurate by your affiant. Your affiant has spoken with task force officers in Baltimore and they have expressed their opinion that CD1 was truthful and accurate.

[2] CD2's information has been corroborated to the extent possible. CD2 has proven to be truthful and accurate.

9

narcotics. CD2 identified Doris CATES as an integral member of the FOB. CD2 described Doris CATES as handling most of the finances for the FOB. Specifically, CD2 explained that Doris CATES was provided with drug proceeds by MAY and her son Demarcus CATES and in turn would pay the rent on the house.

26. On March 8, 2014, the landlord for 2513 Lannie Drive, Hillsborough, NC, made statements to deputies with the Orange County Sheriff's Office that she had begun the eviction process of Doris CATES and her son Tyree CATES from the property due to "ongoing criminal activity at the house."

27. On September 4, 2014, CD3[3] provided extensive details concerning the FOB in Durham and Orange County. During that interview, CD3 explained that Doris CATES would often get bank accounts and credit cards in her name to assist the gang. Additionally, CD3 explained that Doris CATES also went by the name "Rita CATES." Based on records obtained during this investigation your affiant knows the SUBJECT PREMISES' utilities to be in the name of RITA CATES.

28. In October 2016, members of the RDSSTF interviewed Cooperating Witness 1 (CW1) concerning the violent members of the NTG Fire Line and others falling under the Messiah MAY in the Durham area. CW1 provided extensive information concerning interstate prostitution, distribution of narcotics, murders, attempted murders, rapes, interstate transportation of stolen automobiles, bribery and public corruption, and other acts of racketeering being perpetrated by the violent criminal enterprise known as NTG. A significant portion of this information, provided by CW1, has been corroborated by the RDSSTF.

---

[3] CD3 has been determined to be truthful and accurate.

29.    On August 22, 2015, DPD responded to Old Farm Park in Durham, NC, for calls of a gang meeting.  The initial call indicated that there were thirty to forty people throwing up gang signs and smoking marijuana.  Officers responded and detained most of the individuals.  A K9 scan recovered a Glock 27 in the wood line.  During the investigation, several vehicles were scanned by police K9 units.  Search warrants were obtained for three vehicles at the scene.  DPD searched a Nissan Murano and recovered a digital scale, a loaded 9mm handgun, and an extended magazine.  DPD searched a Mercedes Benz, belonging to Messiah MAY, and recovered inmate mail and a "FOB" hat.  MAY was asked why he was wearing blue, a prominent Crip color, and he stated, "I'm big homie, I can wear what I want." During this incident, Tyree CATES became belligerent and threatened the officer.  CATES was arrested for disorderly conduct – speech likely to provoke.  MAY's pronouncement of himself as "big homie" and presence at the property with CATES demonstrated both MAY's leadership role within the NTG and his close association with Tyree CATES.

30.    On May 1, 2017, Tyree CATES admitted himself to Duke University Hospital for a self-inflicted gunshot wound.  Officers with the DPD were already in the Emergency Department on another matter when CATES arrived.  The officers interviewed CATES and he indicated that he had a Glock pistol in his pocket and had shot himself.  CATES would not provide any other information and was not cooperative with law enforcement.

31.    On May 18, 2017, members of the RDSSTF arrested a high-ranking NTG gang member in Wilson, North Carolina.  Subsequently, that gang member provided consent to search his phones.  A search was conducted and it was determined that he had documents hidden inside of his phone that were distributed by NTG leadership in New York.  This large document was hidden inside of a legitimate copy of a court document (motion for appeal).  The document contained gang

news, updates, rules, and new codes and languages. Based on training, knowledge, and experience your affiant knows that it is common practice amongst gang members to transmit and store gang documents inside of digital programs and applications utilized on smartphones, tablets, and computers. Additionally, your affiant knows gang members to store and transmit these gang documents and communications through traditional digital media such as thumb drives or flash drives.

32. On June 9, 2017, Tyree CATES was arrested by the DPD for carrying a concealed weapon. DPD officers responded to a disturbance with a weapon call. Those officers, upon arrival, approached a group of five to seven young black men wearing red and black and standing in a group in the Cornwallis Housing Projects. All of the men fled on foot except for CATES. CATES was approached and stated, "it's legit." CATES explained that he had a firearm. A 9mm pistol was located in his pants pocket. CATES explained that he was recently shot and carried the pistol for protection. He explained to the officers that the gun was legal and he had a concealed carry permit. A check revealed that CATES did not have a conceal carry permit. The weapon was identified as a tan Glock 19, 9mm pistol. Your affiant knows CATES to have displayed this weapon on his Instagram page. Based on training, knowledge, and experience, your affiant knows members of street gangs such as the NTG to frequently be in possession of, and utilize, firearms for the purpose of conducting the criminal activity expected by their membership in such an enterprise.

33. On June 14, 2017, CW2 explained that as recently as the fall of 2016, he had been to the SUBJECT PREMISES and that they were storing guns and drugs in the residence. CW2 explained that he used to be a member of NTG and associated with Messiah MAY. CW2 explained that speaking to law enforcement about Messiah MAY puts his "life on the line." CW2 explained that

MAY would harm his family. CW2 explained that MAY was a dangerous man. MAY hangs out in Hillsborough in a house in Chapel Hill off of Route 54. The house was described as a one story nice house off of a dirt road. CW2 explained that there was a "drug compressor" there. CW2 has seen as many as four ounces of heroin in the SUBJECT PREMISES at one time. CW2 explained that the person at the house was Tyree CATES and that CATES was "directly under Messiah." CW2 explained that he was last there in September 2016 but prior to that he was there "on the regular." CW2 identified CATES' street name as "Supa." CW2 has seen assault rifles in the house. They hide the guns in the shed in the back and in the house as well. CW2 has been locked up since September 2016. CW2 also explained that there is heroin, "lean," and pills in the house. CW2 explained that MAY was also living in Raleigh somewhere. CW2 explained that CATES worked at the Burger King in Hillsborough and resided at the house. CW2 explained that he has been dealing with them since the Farm days. CW2 has been to the Farm. CW2 described MAY as the "Big Homie" in the gang. CW2 has never met anyone higher than MAY in the gang. CW2 knew of the man that was higher and knew him to be in Atlanta. CW2 explained that MAY was under FIRE (Shamuari CARR). CW2 was shown Google maps and CW2 pointed the SUBECT PREMISES out to investigators on the computer.

34. On June 14, 2017, CW2 showed investigators pictures, taken in May 2016, of CW2 at the SUBJECT PREMISES. CW2 explained that when the picture was taken, MAY was inside the house. CW2 explained that he had just purchased "Lean" from MAY. Based on training, knowledge, and experience your affiant knows "Lean" to be Promethazine with codeine, a schedule V controlled substance. Additionally, your affiant knows most of the NTG members to both use and sell "lean."

13

35.     On June 14, 2017, open source database checks revealed that the SUBJECT PREMISES' water/utilities are in the name of "Rita Cates." Through this investigation your affiant is aware that "Rita Cates" is an alias for Doris CATES. Doris CATES, is the mother of Tyree CATES, and has been identified as a nominee for the gang. Doris CATES has frequently registered houses in her name for the use of NTG.

36.     On June 14, 2017, CW1 indicated that CW1 had been present in multiple NTG "trap" houses in which Tyree CATES was distributing narcotics. CW1 clarified that this occurred over several years and involved several houses. CW1 had not been in the presence of Tyree CATES for over a year. CW1 described CATES as one of the most disturbing individuals involved with the NTG or the FOB.

37.     On June 15, 2017, the Facebook page of Doris CATES was reviewed and her screen name was determined to be "motherofbosses." Based on this investigation, your affiant knows this screen name to be a reference to the "Family of Bosses" and a reference to Doris CATES' commitment to the gang and the fact that her sons are members. Based on training, knowledge, and experience your affiant knows that members of criminal street gangs, especially ones with administrative roles such as Doris CATES, maintain documents and other items associated with membership in these criminal enterprises for long periods of time. Additionally, your affiant knows documents such as receipts and other legal documents, not specifically listing the gang or its members, are evidence of transactions conducted on behalf of the gang by a willing third party such as CATES. These documents are also often maintained for long periods of time in one's primary residence along with other important documents.

14

38. On June 15, 2017, the SSTF received confirmation from the U.S. Department of Agriculture that the SUBJECT PREMISES was listed on the account of Doris CATES' food stamp (EBT) account.

39. On June 19, 2017, Duke Power confirmed that the SUBJECT PREMISES' power account was in the name of Santario CATES. Your affiant knows Santario CATES to be the son of Doris CATES. Additionally, your affiant knows, through this investigation that Santario CATES is also a member of the NTG.

## CONCLUSION

40. Based on the forgoing facts, I submit that there is a violent criminal enterprise, that being the NTG, that is currently committing violent acts of racketeering; and that a member of that enterprise, that being Tyree CATES and Doris CATES, are currently residing in the SUBJECT PREMISES. Through the investigation into this criminal enterprise, your affiant has come to know Tyree and Doris CATES to be a very close associates of Messiah MAY. Based on training, knowledge, and experience, your affiant knows gang members, especially those with rank and/or administrative roles in the enterprise, to maintain documents pertaining to gang membership, knowledge, and other affairs of the organization on their person or in their residence. Further, gang members responsible for transferring money to other gang members and holding property for gang members, such as Doris CATES, often keep such records in their residence. Your affiant submits that there is probable cause that currently maintained inside of the SUBJECT PREMISES are documents, both physical and digital, that provide evidence of the above-described criminal enterprise and corrupt law enforcement officers that are assisting that enterprise. Additionally, your affiant submits that there is probable cause to believe that currently maintained inside of the

SUBJECT PREMISES are documents that are critical evidence of the extremely violent criminal enterprise/street gang known as the Nine Trey Gangsters.

41.     Based on the foregoing facts, I further respectfully submit that there is probable cause to search the SUBJECT PREMISES described in Attachment A to seize evidence, contraband, fruits, and/or instrumentalities of crimes, namely, Title 18, United States Code, Section 1962 Racketeer Influenced and Corrupt Organizations (RICO) described in Attachment B.

IT IS REQUESTED that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorize notice to be delayed for a period of 30 days, in order to preserve the integrity of the ongoing investigation.

IT IS FURTHER REQUESTED that the Court authorize the execution of this warrant to occur at any time day or night for good cause shown; specifically,  it is my belief that based on our current investigations, human source reporting, and the potential presence of gang members and weapons inside the SUBJECT PREMISES, it would risk the safety of any law enforcement officer to approach the SUBJECT PREMISES at or after 6:00 am.  By this time in the morning, it is light and the tactical team will be visible and exposed as they approach, increasing the risk of officer casualties should any occupants of the residence be armed and awaiting their arrival.

Eric S. Nye, Special Agent
Federal Bureau of Investigation
United States Department of Justice

SWORN TO AND SUBSCRIBED before me this 20th day of June, 2017

12:50PM .

Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

16

## ATTACHMENT A

**PREMISES TO BE SEARCHED:**

The subject premises, 7035 Canopy Lane, Chapel Hill, North Carolina, 27516, is a white, one story, single family home. The SUBJECT PREMISES is one of four single family homes located on the dead end road, Canopy Lane. The SUBJECT PREMISES is the first house on the left as you enter Canopy Lane from Heels Drive. The house has a driveway to the left of the residence and a white back patio with extended ramp to the driveway area. This residence is clearly marked with a placard which reads "2000."

PROPERTY TO BE SEARCHED AND/OR SEIZED:

This warrant authorizes (i) the search of the property identified in Attachment A for only the following and (ii) authorizes the seizure of the items listed below only to the extent they constitute the following:

(a) Evidence of violations of 18 U.S.C. § 1962 ("subject violation"); or

(b) Any item constituting contraband due to the subject violation, fruits of the subject violation, or other items possessed whose possession is illegal due to the subject violation; or

(c) Any property designed for use, intended for use, or used in committing any subject violation.

Subject to the foregoing, the items authorized to be seized include the following:

(1) Books, records, receipts, notes, ledgers and other papers or records relating to racketeering offenses such as the distribution of controlled substances, money laundering, prostitution, interstate travel, and the bribery of public officials;

(2) Books, records, ledgers, police reports, and other files or reports associated with, or possibly provided by, a corrupt law enforcement officer or public official;

(3) Items of personal property that are associated with racketeering, the distribution of controlled substances, and the associated laundering of those funds, to include but not limited to: bulk U.S. currency, high-end electronic equipment, entertainment systems, precious metals, gems, jewelry, art, clothing, and collectible purchases or disbursements and gifts.

(4) Personal books and papers reflecting names, addresses, telephone numbers, and

1

other contact or identification data relating to the operation of the Nine Trey Gang (NTG), distribution of controlled substances, money laundering, fraudulent employment, tax documents, and real estate;

(5) Any and all documents considered to be NTG "gang knowledge" or other forms of written NTG rules, news, leadership structure, membership, and history;

(6) Any and all state and Federal tax documents, in whatever form found; any letters or documents indicating employment that might be used in association with tax preparations such as, but not limited to: leave and earning statements, official letters, mail or communications from employer, payment stubs, checking statements indicating direct deposits from employer;

(7) Items of personal property indicating membership of NTG (or any other violent neighborhood gang), including but not limited to: shirts or other clothing apparel, photographs, personal telephone and address book, or any items bearing colors, symbols, or other violent gang affiliation;

(8) Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises that is the subject of this warrant, including but not limited to canceled mail, deeds, leases, titles, registration information, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, tax documentation, identification cards, immigration documentation, birth certificates, and keys;

(9) Documents indicating travel in interstate and foreign commerce, including airline, bus or train tickets, notes and travel itineraries; airline, bus or train schedules; bills; charge card receipts; hotel, motel, and car rental statements; correspondence with

2

travel agencies and other travel-related businesses; airline, rental car, and hotel frequent flier or used cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel;

(10)     Records reflecting the use of cellular telephones, calling cards, voicemail, computers, Internet e-mails, Internet Instant Messaging services, or answering services;

(11)     Cellular telephones;

(12)     Records and documents to be seized shall include computer data, computer hardware and hard drives, Compact Discs, Floppy Disks, and DVD's, peripherals, cables, software, and manuals; all of which may be removed from the searched premises to be examined off-site under controlled conditions, to be examined by law enforcement personnel and by persons specially trained in the recovery of computer data.

3